UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------------------x

JOSEPH DICARLO, JR.,

        Plaintiff,

  -against-

CAROLYN W. COLVIN, Acting Commissioner, Social Security
Administration,

        Defendant.

-------------------------------------------------------------------------------------x

**FILED**
**CLERK**
9/9/2016 12:24 pm

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

**Memorandum of**
**Decision & Order**
15-cv-0258(ADS)

<u>APPEARANCES:</u>

**Law Offices of Sullivan & Kehoe, LLP**
*Attorneys for the Plaintiff*
44 Main Street
Kings Park, NY 11754
        By:     Michael Brangan, Esq., Of Counsel

**U.S. Attorney's Office, Eastern District of New York**
*Attorneys for the Defendant*
610 Federal Plaza, 5th Floor
Central Islip, NY 11722
        By:     Matthew Silverman, Assistant U.S. Attorney

**SPATT, District Judge:**

On January 16, 2015, the Plaintiff Joseph DiCarlo, Jr. (the "Plaintiff") commenced this civil appeal pursuant to the Social Security Act (the "Act"), 42 U.S.C. § 405 *et seq.*, challenging a final determination by the Defendant Acting Commissioner of Social Security Carolyn W. Colvin (the "Commissioner"), that he is ineligible to receive Social Security disability insurance benefits.

Presently before the Court are the parties' cross-motions, pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 12(c), for judgment on the pleadings. For the reasons that follow, the Commissioner's motion for judgment on the pleadings is granted; the Plaintiff's cross-motion for

judgment on the pleadings is denied; and the Commissioner's denial of benefits is affirmed in its entirety.

## I.      BACKGROUND

On March 31, 2011, the Plaintiff, then 48 years old, injured his shoulder while lifting heavy merchandise in his capacity as a Sales Associate at Home Depot. He did not return to work following his injury, and on June 1, 2012, he applied for Social Security disability insurance benefits.

On August 14, 2012, the Social Security Administration ("SSA") denied his application.

On reconsideration, including a hearing held on May 9, 2013, Administrative Law Judge Seymour Raynor (the "ALJ") upheld the SSA's initial determination that the Plaintiff was not eligible to receive disability insurance benefits. In particular, on June 27, 2013, the ALJ issued a written decision concluding that, during the period of time from March 31, 2011 through September 30, 2012 (the "Relevant Time Period"), the Plaintiff retained the functional capacity to perform the full range of "light work" jobs, which existed in significant numbers in the national economy.

On November 21, 2014, the Commissioner's Appeals Council denied the Plaintiff's request for appellate review of the ALJ's determination, making the ALJ's May 9, 2013 written decision the final decision of the Commissioner.

On January 16, 2015, the Plaintiff commenced this civil appeal.

On September 11, 2015, the parties' cross-motions for judgment on the pleadings were fully submitted to the Court.

## A.      The Non-Medical Evidence

### 1.      The May 9, 2013 Administrative Hearing

On May 9, 2013, the Plaintiff, then 50, appeared *pro se* for an administrative hearing.

He testified that he is single, without children, and lives in a house with his parents. After completing one year of college, the Plaintiff held a series of jobs before becoming a Sales Associate in the garden/landscaping department at Home Depot. According to the Plaintiff, this involved

stocking the shelves with inventory; rearranging the store displays; and performing general maintenance, such as sweeping and picking up items from the floor. He worked in that capacity for approximately two-and-a-half months, before he was injured on the job trying to lift a large bar-b-que. In particular, the Plaintiff testified that he immediately experienced "extraordinary, huge pain" in his right shoulder when he tried to lift the box, but did not go to the emergency room at that time. Instead, he filed an accident report with his manager; finished his shift at the store; and went home.

The next morning, on April 1, 2011, upon awakening, the Plaintiff went to the emergency room at Southampton Hospital. The Plaintiff testified that the medical staff at the hospital gave him pain relief medication and recommended that he see an orthopedist.

Shortly thereafter, the Plaintiff began treatment with orthopedic surgeon Henry Marano, M.D., and was still under Dr. Marano's care at the time of the hearing. Dr. Marano's treatment records are discussed at greater length below.

With regard to his activities of daily living, the Plaintiff testified that he can shower, shave slowly, and get dressed, all without help. In this regard, he stated that he can remove pants from his closet; put on a coat slowly; button buttons; tie a bow; zip a zipper; and buckle a belt buckle, although he stated that his shoulder injury prevents him from reaching around his body to string a belt through the loops on his pants. He testified that he is forced to use his left hand to perform hygienic activities such as combing his hair and squeezing toothpaste from the tube. Similarly, he has trouble pulling a shirt over his head, because he is unable to lift his right hand – which, the Court notes, is his dominant hand – above shoulder-height. The Plaintiff stated that he can still write, although it takes him longer than it used to.

The Plaintiff stated that he can drive, although he has difficulty rotating the steering wheel with his right arm. He is able to go shopping for food and clothing, but requires the assistance of his father if he purchases anything heavy, such as containers of liquid. Although he did not specify a

weight that he is unable to lift, he testified that he has "a hard time" carrying bags of groceries; bottles of water; and pushing a shopping cart.

The Plaintiff testified that he only opens doors using his left hand. He does his own laundry, sometimes with the help of his parents; cooks for himself; does the dishes; and takes out the garbage, although he relies predominantly on his left hand to perform these activities. He occasionally sweeps the kitchen floor, but does not vacuum or mop. He can eat with a fork and knife, and hold a cup of coffee, but cannot operate a can opener.

The Plaintiff stated that he is able to climb stairs; stand for a half hour; walk a mile; and sit for "a few" hours. He testified that he is able to lift 20 pounds with his left arm.

With regard to his physical symptoms, the Plaintiff testified that he experiences severe pain in his right arm and shoulder. At the hearing, he rated his pain a 7/10, but stated that it sometimes increases to a 9/10. He testified that he experiences this pain "generally," but that it can be exacerbated by certain movements, such as rolling over in bed, which has made it difficult for him to sleep. However, he stated that medication has been effective in relieving some of his pain.

2.      The July 10, 2012 Function Report

On July 10, 2012, apparently in support of his June 1, 2012 application for disability insurance benefits, the Plaintiff completed a function report detailing certain alleged limiting effects of his shoulder impairment.

Consistent with his hearing testimony the Plaintiff indicated that, on a regular day, he practices general hygiene; performs light chores, such as sweeping and washing dishes; and treats his injured shoulder with ice packs and a transcutaneous electrical nerve stimulation ("TENS") unit, *i.e.*, a noninvasive method of pain management. He stated that daily activities such as getting dressed and bathing take significantly longer than they did before his accident, and he now only uses his left hand to eat, shave, and care for his hair.

The Plaintiff indicated that he is able to drive, but uses his left hand to turn the steering wheel. He also goes shopping for food and household items once every week or two.

The Plaintiff indicated that, prior to his accident he was able to perform physical labor, such as landscaping, home improvement projects, and automobile repairs. He stated that he had long helped his parents with these responsibilities around their house. However, he indicated that he is now limited to performing certain minor tasks, such as sweeping, cleaning windows, and mowing the lawn, with one arm.

He also listed his hobbies as including football, baseball, landscaping, kayaking, swimming, lifting weights, and playing guitar and drums. However, he indicated that, after his accident, he cannot partake in any of these activities, except playing the guitar, which he now does only briefly approximately twice a week.

With regard to his symptoms, consistent with his hearing testimony, the Plaintiff indicated that he awakens frequently during the night due to pain from rolling over in his sleep. He stated that he experiences sharp pain in his elbow and a dull ache down his entire arm. Occasionally, the pain radiates to the back of his right shoulder and neck. At the time he completed the function report, the Plaintiff reported "less excruciating" pain than immediately after the accident, but nevertheless stated that he experiences pain "on and off" every 15 minutes throughout the day and night. He was taking prescription Tramadol and over-the-counter aspirin to manage his symptoms.

The Plaintiff also stated that he is unable to lift objects weighing over 15 pounds, and has difficulty using his right arm to transfer his body weight in order to kneel, squat, and get up and down from a seated position. He indicated that he can use both of his hands – the right one less than before – but cannot reach or extend his right arm without pain.

He stated that he has experienced some depression, as his social life has "disappeared" since his accident and he is in financial straits. However, he was not taking any medication for

psychologic symptoms and stated that he did not believe his depression would affect his ability to work.

In this regard, the Plaintiff indicated that he can follow spoken and written instructions; can finish what he starts; and has no problems getting along with authoritative figures. He reported "just a little" difficulty concentrating, and "slight[ ]" memory loss, both of which he attributed to his medication. He also reported no known stressors, reporting an ability to adapt to new situations.

**B.    The Medical Evidence**

The administrative record contains medical reports from a number of treating and consulting physicians. The Court will summarize this evidence to the extent necessary to resolve the present cross-motions.

**1.    April 1, 2011 Emergency Room Records**

As noted above, on April 1, 2011, *i.e.*, the morning after the Plaintiff's accident, he visited the emergency room at Southampton Hospital.

The triage notes reflect that the Plaintiff appeared in no acute distress and rated his pain a 3/10. No functional impairments were noted. He reported tenderness in his right shoulder and pain when raising his arm above chest-height, which, in the impression of the attending physician Dr. Michael Ameres, was consistent with a rotator cuff injury. The Plaintiff declined x-rays at that time.

Dr. Ameres prescribed 600mg tablets of Ibuprofen for pain. He also instructed the Plaintiff to wear a sling; apply ice intermittently; and to refrain from lifting objects weighing more than five pounds for at least a week. He also instructed the Plaintiff to follow up with an orthopedic surgeon.

**2.    Long Island Bone and Joint, LLP / Henry Marano, M.D.**

Shortly after his accident, the Plaintiff began treatment at a medical practice known as Long Island Bone and Joint, LLP ("LIBJ") in Southampton. As he testified during the hearing, the Plaintiff contends that Dr. Henry Marano, a board-certified orthopedic surgeon affiliated with LIBJ, is his treating physician for purposes of the Commissioner's regulations. *See* 20 C.F.R. § 404.1527(c)(2).

On April 4, 2011 – four days after the accident – the Plaintiff presented to LIBJ and was examined by a Dr. Matthew H. Walker. The Plaintiff complained of moderate persistent pain in his right shoulder, which was successfully relieved with Ibuprofen. Dr. Walker's physical examination of the Plaintiff's shoulder revealed some tenderness over the supraspinatus, one of the four muscles comprising the rotator cuff. The Plaintiff displayed the following limited ranges of motion in his right shoulder: abduction of 80 degrees; flexion of 150 degrees; external rotation of 40 degrees; and internal rotation to T10. Dr. Walker diagnosed a strained and/or sprained rotator cuff, with a likely tear. He referred the Plaintiff for an MRI and declared him "fully disabled" for Workers' Compensation purposes due to a "100% temporary impairment."

An MRI performed on April 13, 2011 confirmed a tear in the labrum of the Plaintiff's right shoulder joint, as well as subcoracoid bursitis and moderate acromioclavicular arthrosis, with moderate stenosis of the subacromial space. There was no evidence of tearing, edema, or atrophy of the Plaintiff's rotator cuff, and the bicipital tendon was intact.

On April 19, 2011, during a follow-up visit to LIBJ, the Plaintiff was examined by Dr. Marano. The Plaintiff reported that the pain in his right shoulder, which he now rated a 10/10, had been constant since his last visit. His ranges of motion remained limited: abduction of 80 degrees; flexion of 90 degrees; external rotation of 40 degrees; and internal rotation to L4. However, Dr. Marano's notes indicate that, after discussing the diagnosis and treatment options, the Plaintiff elected to treat his injury non-operatively at that time, through strengthening exercises and physical therapy. Dr. Marano prescribed 2500mg tablets of Arthrotec, a nonsteroidal anti-inflammatory medication ("NSAID"), and reiterated that the Plaintiff remained fully disabled for Workers' Compensation purposes.

On May 12, 2011, the Plaintiff followed up with Dr. Marano, at which time he denied experiencing any new problems, but reported that his shoulder pain, which now registered a 9/10,

persisted. His ranges of motion remained mostly the same: abduction of 85 degrees; flexion of 85 degrees; external rotation of 40 degrees; and internal rotation to L4.

The Plaintiff also complained of moderate pain in his right elbow, which he rated a 5/10. He displayed the following ranges of motion in his elbow joint: flexion of 130 degrees; extension of 0 degrees; passive forearm supination of 85 degrees; and passive forearm pronation of 90 degrees. Dr. Marano diagnosed lateral epicondylitis, more commonly referred to as "tennis elbow."

Again, the Plaintiff apparently elected to continue to with noninvasive treatment, including strengthening exercises and physical therapy, for both conditions. Dr. Marano noted that the Plaintiff remained fully disabled at that time for Workers' Compensation purposes.

On June 3, 2011, during another follow-up visit to LIBJ, the Plaintiff was examined by a certified Registered Physician Assistant named Felipe Monteiro. Monteiro noted that the Plaintiff reported a worsening of his shoulder pain, which had apparently increased to a 10/10. Monteiro also noted tenderness over the Plaintiff's right supraspinatus and the long head of the biceps in his right arm. Ranges of motion in the right shoulder were: abduction of 85 degrees; flexion of 85 degrees; external rotation of 40 degrees; and internal rotation to L4.

Monteiro also noted tenderness in the Plaintiff's right elbow at the lateral epicondyle tendon. His elbow range of motion was unchanged since the prior visit.

In addition to his existing rotator cuff injury and tennis elbow, Monteiro assessed a ruptured biceps tendon and bicipital tenosynovitis, i.e., an inflammation of the tendon and sheath lining of the biceps muscle. He referred the Plaintiff for ultrasound imaging of the affected area. According to LIBJ, the Plaintiff remained fully disabled at that time for Workers' Compensation purposes.

On June 14, 2011, the Plaintiff followed up with Dr. Marano, who noted that the Plaintiff had developed pain radiating from his right bicep into his shoulder. A physical examination revealed tenderness, as well as discoloration – "ecchymosis" – and misshapenness in the Plaintiff's right bicep, as well as tenderness over his right supraspinatus. Dr. Marano noted the following ranges of motion

in the right shoulder: abduction and flexion of 85 degrees; external rotation of 40 degrees; and internal rotation to L4. His elbow range of motion was unchanged.

Dr. Marano indicated that the Plaintiff remained fully disabled at that time for Workers' Compensation purposes.

An MRI performed on June 28, 2011 revealed evidence of a ruptured biceps tendon, in addition to the known labral tear. The associated report also notes mild tendinopathy of the infraspinatus, another of the muscles comprising the rotator cuff.

On July 5, 2011, during a follow-up visit to LIBJ, the Plaintiff was initially examined by Meghan Nowakowski, whose professional title is not supplied. Nowakowski's notes indicate that the Plaintiff denied any new problems, and reported that his shoulder pain, though constant, had decreased to a 5/10. She also noted that the Plaintiff's schedule of home exercise, physical therapy, and NSAID treatment had been effective in reducing his symptoms.

Later in the same visit, the Plaintiff was examined by Dr. Marano, who noted that the Plaintiff's ranges of motion in his right shoulder and elbow were unchanged. Dr. Marano observed continued tenderness, discoloration, and misshapenness in the Plaintiff's right biceps, and tenderness in his right supraspinatus. Dr. Marano declared the Plaintiff "partially" disabled for Workers' Compensation purposes due to a "50% temporary impairment." Nevertheless, on this date, the Plaintiff apparently elected to undergo arthroscopic surgical repair of his injured shoulder.

On September 19, 2011, Dr. Marano operated on the Plaintiff at Southampton Hospital. The procedure consisted of a right shoulder arthroscopy; labral debridement; subacromial decompression and bursectomy; AC joint resection; and rotator cuff repair.

On September 27, 2011, the Plaintiff visited LIBJ for his first post-operative appointment. Upon physical examination, Dr. Marano noted that the Plaintiff's surgical incision was healing well without any signs of infection. His sutures were successfully removed. The Plaintiff reported generalized tenderness in his right upper extremity and displayed some weakness on abduction, *i.e.*,

9

laterally raising the arm. He displayed passive flexion and abduction of 80 degrees, but was unable to perform external or internal rotation. Dr. Marano prescribed 325mg tablets of Percocet, a pain reliever, and ordered the Plaintiff to continue physical therapy and home strengthening exercises.

On October 25, 2011, the Plaintiff visited LIBJ for a second post-operative appointment. The Plaintiff, who had recently turned 49 years old, reported no new symptoms, although the relevant treatment records reflect repeated complaints of severe pain. His shoulder ranges of motion were unchanged since his prior visit, and there was apparently no physiological worsening of his condition.

On November 29, 2011, the Plaintiff again followed up with Dr. Marano, who noted that the Plaintiff's pain, which he now rated a 9/10, persisted. The notes from this visit reflect that, on or about November 14, 2011, the Plaintiff had received a prescription refill for 325mg Percocet tablets. On this date, Dr. Marano also prescribed 325mg tablets of Ultracet, another pain reliever.

A physical examination performed on this date again revealed generalized tenderness in the upper right extremity, although diminished signs of ecchymosis. The Plaintiff's shoulder ranges of motion increased to passive abduction of 90 degrees; passive flexion of 100 degrees; external rotation of 60 degrees; and internal rotation to the hip.

On November 30, 2011, Felipe Monteiro prescribed 50mg tablets of Tramadol for the Plaintiff's pain.

On January 10, 2012, the Plaintiff followed up with LIBJ, and again received an initial examination from Meghan Nowakowski, whose notes from this visit indicate that the Plaintiff reported worsening symptoms, including 9/10 pain radiating from his right biceps into his shoulder.

During the same visit, Dr. Marano performed a physical examination, which again revealed generalized tenderness, but normal sensation and no discoloration of the affected area. The Plaintiff's ranges of motion were unchanged, except for his ability to perform external rotation, which increased to 90 degrees.

Dr. Marano also noted persistent tenderness in the Plaintiff's right elbow, although his range of motion was materially the same as it was prior to his surgery. Dr. Marano ordered an MRI of the Plaintiff's bicep, and again declared him fully disabled for Workers' Compensation purposes. On this date, Dr. Marano also prescribed a refill for 325mg Ultracet tablets.

An MRI performed on January 27, 2012 confirmed a rupture of the long head of the Plaintiff's right biceps with proximal retraction.

On February 17, 2012, the Plaintiff followed up with Dr. Marano, who noted that, consistent with the latest MRI results, the Plaintiff's pain, which he rated a 10/10, was now concentrated in his mid-bicep region. At the time of this visit, the Plaintiff was taking several pain medications, including Ultracet, Percocet, and Tramadol.

However, the results of a physical examination were unremarkable. In particular, Dr. Marano again noted only generalized tenderness in the Plaintiff's upper right extremity, with normal sensation and no discoloration. He noted some weakness on abduction, but shoulder ranges of motion that had remained the same or increased since prior visits. The Plaintiff performed passive abduction of 90 degrees; passive flexion of 110 degrees; external rotation of 80 degrees; and internal rotation to the hip.

Nevertheless, Dr. Marano diagnosed traumatic arthritis in the right shoulder. He ordered another MRI and referred the Plaintiff for pain management treatment.

Further, although Dr. Marano's examination of the Plaintiff's right elbow was unremarkable as compared to prior visits, he reported some persistent tenderness and no changes in the Plaintiff's range of motion. He prescribed a refill for 325mg Ultracet tablets and declared the Plaintiff fully disabled for Workers' Compensation purposes.

On March 20, 2012, the Plaintiff followed up with Dr. Marano, again complaining of persistent shoulder pain that he rated an 8/10, and for which he continued taking the various pain medications outlined above. However, Dr. Marano noted that the Plaintiff had regained his full

range of internal shoulder rotation, and had either stayed the same or improved in his ability to perform the other critical joint motions, including passive abduction of 90 degrees; passive flexion of 150 degrees; and external rotation of 80 degrees. His examination of the Plaintiff's elbow joint revealed no material changes from prior visits.

Dr. Marano continued the Plaintiff on 325mg Ultracet for elbow pain, and recommended using a TENS unit for persistent shoulder pain. Dr. Marano noted that the Plaintiff remained fully disabled at that time for Workers' Compensation purposes, and explicitly stated that he "d[oes] not believe [the Plaintiff] will return to manual labor."

On April 24, 2012, the Plaintiff presented to LIBJ without any new symptoms, but still complaining of 10/10 localized pain in his biceps. Dr. Marano noted some atrophy – expired cellular tissue – and generalized tenderness over the long head of the right bicep. His shoulder and elbow ranges of motion remained unchanged from the prior visit.

Dr. Marano's notes from this visit indicate that he discussed with the Plaintiff the diagnosis and treatment options for the traumatic arthritis in his surgically-repaired shoulder and his tennis elbow. However, the Plaintiff apparently elected to treat these conditions non-operatively at that time. Dr. Marano recommended vocational rehabilitation, continued physical therapy, and strengthening exercises. He also noted that the Plaintiff was unable to return to his prior job. The Plaintiff remained fully disabled for Workers' Compensation purposes.

The Plaintiff followed up with Dr. Marano on May 22, 2012. At that time, the Plaintiff reported no new symptoms, and had apparently discontinued the use of prescribed pain medications. A physical examination revealed ranges of shoulder motion consistent with his prior visit, and an improved range of elbow motion, namely, increased flexion of 140 degrees.

Dr. Marano prescribed a refill for 325mg Ultracet tablets and declared the Plaintiff fully disabled for Workers' Compensation purposes. He again recommended vocational rehabilitation and continued physical therapy to treat the Plaintiff's persistent shoulder symptoms.

Most recently, on June 20, 2012, the Plaintiff followed up with Dr. Marano. Again, the Plaintiff denied new symptoms, though he complained of persistent right shoulder pain that he rated a 9/10, for which Dr. Marano prescribed a refill for 325mg Ultracet tablets. A physical examination of his right upper extremity, including his shoulder and elbow, was materially the same as in the prior visit, and Dr. Marano's course of recommended treatment was unchanged. According to Dr. Marano, the Plaintiff remained fully disabled for Workers' Compensation purposes.

3.     **Examining Physician James F. Morrissey, M.D.**

On May 12, 2011, apparently in connection with his claim for Workers' Compensation benefits, the Plaintiff was examined by Dr. James Morrissey, an orthopedic surgeon affiliated with Yonkers Orthopedic Associates, P.C. in North Haven.

Dr. Morrissey noted that, despite undergoing physical therapy for a week-and-a-half, the Plaintiff complained of severe right shoulder pain and an inability to raise his right arm laterally (abduction) or upward to the front (flexion).

A physical examination revealed acute tenderness about the anterior and posterior aspects of the Plaintiff's right shoulder, as well as "entirely limited" ranges of motion. In particular, Dr. Morrissey noted that the Plaintiff could only perform 20 degrees of abduction and flexion, and that external and internal rotations were both "very painful."

On this date, Dr. Morrissey furnished the following medical opinion:

> In my opinion, [labral tear in the right shoulder] is a correct diagnosis and [the Plaintiff's] current treatment is reasonable and necessary. I would advise his continuing physical therapy three times a week for a period of four weeks. If he does not improve with the conservative therapy at that point, there is an indication for repair of the glenoid tear. It is my opinion that very likely the surgical repair will be indicated. This diagnosis is causally related to the accident of 3/31/11 at which time he was doing heavy lifting. His treatment thus far is related to this injury. . . In my opinion, at the present time, considering his degree of pain and limited motion in his dominant extremity, he has a total disability which is temporary. He has not reached maximum medical improvement and it would be difficult to determine this without noting his progress with therapy and/or surgery.

R. 288.

Approximately six months later, on November 10, 2011, the Plaintiff again visited Dr. Morrissey, who noted that the Plaintiff had undergone surgical repair of his right shoulder; was under the care of Dr. Marano; and had been attending physical therapy three times a week.

Dr. Morrissey noted that the Plaintiff continued to complain of persistent severe pain in the affected area, including his right elbow, although he reported that physical therapy was helping to relieve some of the pain and was also improving his range of motion. The Plaintiff also reported that physical therapy itself was "quite painful."

A physical examination revealed improved ranges of motion, including abduction to 45 degrees; flexion to 80 degrees; and external rotation to 40 degrees. The Plaintiff's ability to perform internal rotation remained "very minimal" and Dr. Morrissey noted some persistent tenderness in the shoulder. He also noted that the Plaintiff's surgical wounds were well-healed and "very indistinct."

On this date, Dr. Morrissey furnished a second medical opinion, as follows:

> The diagnosis [status post arthroscopy right shoulder] is correct and is now supported by the operative findings indicating a labral tear, biceps tendon repair, impingement syndrome, rotator cuff tear, and acromioclavicular joint arthropathy. [The Plaintiff's] treatment, including the surgery, has been reasonable and necessary, and his physical therapy now post[-]surgery three times a week is also appropriate. There is evidence that he is responding to the therapy, he notes the pain to be a bit less, and the range of motion improving. Further treatment would consist of continuing physical therapy three times a week for a period of six weeks.
>
> *       *       *
>
> At this point since he is now in the postop status, he is not able to return to work. Functional capacity evaluation is not recommended. He has not reached maximum medical improvement, which I would anticipate in approximately six weeks. At the present time he has marked partial disability. He is not able to return to his former work activities and cannot return to work with restrictions or modified duty.

R. 285-86.

On March 29, 2012, the Plaintiff visited Dr. Morrissey for a third time, complaining of occasional sharp pains in various aspects of his shoulder and biceps. At that time, the Plaintiff reportedly attended physical therapy twice a week.

A physical examination of the Plaintiff's right shoulder revealed no redness, swelling, or deformity. However, Dr. Morrissey noted a deformity in his right bicep, namely, a distal retraction of the muscle so that it appeared bunched up in the upper portion of his arm. Nevertheless, the Plaintiff again displayed an improved range of motion, including abduction of 120-145 degrees (increased from 45 degrees four-and-a-half months earlier); flexion of 120-145 degrees (increased from 80 degrees); external rotation of 45 degrees (increased from 40 degrees); and internal rotation to the lower lumbar area (improved from total inability to perform the movement).

Dr, Morrissey furnished a third medical opinion, as follows:

[The Plaintiff's] current treatment in my opinion is reasonable and necessary, and he appears to be making some progress with his physical therapy. I would advise continued physical therapy twice a week for a period of six weeks [until May 10, 2012], at which point it will have reached its maximal benefit.

Mr. DeCarlo [*sic*], in my opinion, is restricted as to working in his usual capacity. He would be able to do light duty activities that would not entail lifting with his right upper extremity over 10 pounds. He has not as yet reached maximum medical improvement; I would anticipate this in a further six-week period with some further physical therapy as well as home exercises. He currently has a moderate partial disability. He can return to a modified duty status, as I have mentioned, at this time. I would anticipate maximum medical improvement in six weeks. . . .

R. 283.

4.    **Consulting Physician Samir Dutta, M.D.**

On August 2, 2012, on referral from the SSA's Division of Disability Determination, the Plaintiff visited Dr. Dutta for an orthopedic evaluation.

Dr. Dutta noted that the Plaintiff reported constant pain and soreness in his right shoulder, which was worsened by any kind of stress or physical activity. He obtained relief through pain medication; applying ice; and using a TENS unit.

With respect to his activities of daily living, the Plaintiff indicated that he showers and dresses himself; that he cooks and shops; and that he watches TV, listens to the radio, and reads. He appeared in no acute distress and had a normal gait and station. He required no assistive devices to

ambulate, and performed a variety of physical processes, including walking on his heels and toes without difficulty; squatting fully; rising from a chair without difficultly; and getting on and off the exam table without assistance. He had close to normal grip strength, with "okay" dexterity. He was able to tie shoelaces, button a buttons, and zip a zipper with both hands.

A physical examination of his right shoulder revealed an ability to abduct to 125 degrees. This was almost the same as his range of motion in the non-injured left shoulder, with which he could perform similar movements to 130 degrees. Dr. Dutta noted that the Plaintiff had also displayed full internal and external rotation bilaterally.

The Plaintiff displayed a mildly limited ability to supinate his right wrist, but otherwise possessed the full range of motion in his elbows. He had 5/5 strength in the proximal and distal muscles. However, Dr. Dutta noted a loss of muscle bulk on the right biceps tendon, with some associated weakness.

Dr. Dutta diagnosed: (1) "post-repair of biceps tendon proximally repair with atrophy, post-arthroscopy right repair, right torn rotator cuff"; and (2) hypertension. With respect to the Plaintiff's functional capacity, he assessed no limitation in the ability to sit, stand, or walk, and a moderate limitation in his ability to lift heavy weight using the right hand on a continuous basis. He also assessed a moderate limitation in the ability to pronate and supinate the right wrist and forearm, and a related limitation driving.

**5.      Consulting Psychologist Kathleen Acer, Ph. D.**

Also on August 2, 2012, again on referral from the SSA, the Plaintiff visited Dr. Acer for a psychiatric evaluation.

Dr. Acer noted that the Plaintiff reported a depressed and nervous mood following his shoulder injury, although he was not then, and never had sought treatment for psychological symptoms. In this regard, the Plaintiff reported weight gain and frequently awakening at night. He also reportedly lacked energy and motivation; experienced trouble focusing and concentrating; and

felt nervous, jittery, and tense.  He reported having suicidal ideations at some time in the summer of 2011, but not since.

With respect to the evaluation, Dr. Acer noted that the Plaintiff drove himself from his home in Quogue to the appointment in Bohemia, and was cooperative during their meeting.  According to her report, the Plaintiff was well-groomed and dressed appropriately; he displayed normal posture and motor behavior; and made appropriate eye contact.  He spoke fluently and clearly, although "somewhat pressured due to anxiety," and showed adequate expressive and receptive language skills.  She described his general affect as "tense" and his mood as "nervous."

The Plaintiff's attention and concentration were intact, although Dr. Acer described his demeanor as "somewhat over-inclusive and difficult-to-focus." In this regard, she observed signs of a "[r]ather irrelevant and scattered" thought process, although she discerned no overt evidence of hallucinations, delusions, or paranoia.

In any event, Dr. Acer noted that the Plaintiff's recent and remote memory skills were intact; he possessed average intellectual skills and had a general fund of information that was appropriate to his experience; and he displayed fair judgment and insight.

With respect to his activities of daily living, the Plaintiff reported the ability to dress, bathe, and groom himself.  He occasionally cooked, did some limited cleaning, and performed other light household chores.  He also reportedly did the shopping, managed his own finances, and drove a car. He also claimed to spend his days reading, watching TV, gardening, and cleaning his car.

The Plaintiff reported adequate relationships with his family, but somewhat limited socialization.

Dr. Acer concluded that the Plaintiff was able to follow and understand directions and instructions; appropriately perform tasks; maintain attention and concentration; and maintain a regular schedule.  She opined that he may experience some difficulty dealing with stress and adequately relating with others.  However, while the results of her evaluation appeared to be

consistent with some stress-related issues, Dr. Acer concluded that they did not appear to be sufficiently severe to interfere with his ability to function on a daily basis. In her opinion, his prognosis was good.

## C.   The ALJ's June 27, 2013 Decision

In this appeal, the Plaintiff challenges the ALJ's findings contained in a June 27, 2013 written decision.

The ALJ found that, during the period of time from March 31, 2011 through September 30, 2012 (previously defined as the "Relevant Time Period") the Plaintiff suffered from a severe impairment, namely, "Right Upper Extremity Internal Derangement Status-post Surgical Repair," that caused more than minimal limitations on his ability to perform basic work activities.

The ALJ also considered the evidence of record pertaining to the Plaintiff's allegations of depression, and, applying the four criteria set forth in the Act for assessing the functional limitations of mental disorders – namely, the activities of daily living; social functioning; concentration, persistence, and pace; and episodes of decompensation – concluded that any medically determinable affective disorder was nonsevere.

Further, of importance, notwithstanding the severe impairment caused by his shoulder injury, the ALJ found that the Plaintiff retained the residual functional capacity ("RFC") to sit and stand and/or walk for up to six hours in an eight-hour workday; to lift and/or carry up to 20 pounds occasionally; and to lift and/or carry up to 10 pounds frequently. Thus, the ALJ concluded that the Plaintiff's RFC would permit him to perform the full range of "light work," as that term is defined in 20 C.F.R. § 404.1567(b).

In reaching this conclusion, the ALJ implied that the so-called Treating Physician Rule – which requires that ALJs give controlling weight to the reports of a claimant's treating physicians or supply good reasons for not doing so – was inapplicable in this case because "[t]here was no treating opinion evidence to weigh . . ." R. 17. The ALJ noted that, to the extent that doctors from LIBJ

repeatedly declared the Plaintiff "disabled" for Workers' Compensation purposes, that conclusion was entitled to no special significance, as it purports to answer a question reserved for the Commissioner.

Nevertheless, the ALJ discussed the content of LIBJ's treatment records, noting that Plaintiff followed up with that practice shortly after his accident, and subsequently underwent three separate shoulder MRIs, as well as surgery at the hands of Dr. Marano. In this regard, the ALJ noted that, during post-operative visits, the Plaintiff complained of intermittent pain, numbness, and weakness, and displayed generalized tenderness over the long head of the biceps, with normal sensation and some limitations in range of motion. The ALJ also noted that the Plaintiff was prescribed NSAIDs, multiple pain relievers, and physical therapy, the notes from which indicate that, as of May 2012, the Plaintiff's range of motion was approaching full.

However, the ALJ did not explicitly state how much weight he decided to give the medical evidence relating to the Plaintiff's treatment with Dr. Marano, other than to broadly state that his RFC assessment is supported by the records of LIBJ.

In contrast, the ALJ accorded "great weight" to the reports of Dr. Morrissey, who opined in late-March 2012 that the Plaintiff would reach maximal medical improvement after six more weeks of physical therapy, and could "perform light duty activities that would not entail lifting over ten pounds with the right upper extremity." The ALJ concluded that Dr. Morrissey's opinion was "consistent with the examinations, the clinical signs displayed therein and the progress noted in physical therapy records."

The ALJ also accorded "some weight" to the reports of consulting orthopedist Dr. Dutta, who opined that the Plaintiff had "no limitation with sitting, standing or walking, moderate limitation with lifting heavy weight using the right hand on a continuous basis and moderate limitations driving." According to the ALJ, this opinion was "generally consistent with the examination, in which the claimant displayed some limitation with the right upper extremity."

Finally, the ALJ found that, although the Plaintiff's injury could reasonably be expected to cause the alleged symptoms, his statements concerning the intensity, persistence, and limiting effects of his symptoms were not entirely credible. In this regard, the ALJ relied upon the evidence of the Plaintiff's activities of daily living, noting that he is able to shower independently; comb his hair with his left hand; shave slowly; dress; button; zip; tie bows; pull on a t-shirt; do laundry; wash dishes; open an envelope; climb stairs; hold a cup of coffee; prepare simple meals; drive; and use a computer.

Thus, although the ALJ found that the Plaintiff was incapable of performing his past work as a sales associate at Home Depot, given his age; his high school education; his ability to communicate in English; his prior work experience; and his capacity to perform light work, the ALJ determined that there were nevertheless jobs that existed in significant numbers in the national economy that the Plaintiff could have performed. Therefore, the ALJ determined that the Plaintiff was not disabled under the Act during the Relevant Time Period.

D.    **The Present Appeal**

In this appeal, the Plaintiff sets forth four arguments in support of overturning the ALJ's conclusion that he was not disabled during the Relevant Time Period.

First, the Plaintiff contends that the ALJ failed to properly weigh the medical evidence pertaining to Dr. Marano. In particular, the Plaintiff argues that Dr. Marano was his treating physician within the meaning of the Commissioner's regulations and the Treating Physician Rule, and therefore, the ALJ erred in failing to give controlling weight to: (i) his repeated assertion that the Plaintiff was "fully disabled" for Workers' Compensation purposes; and (ii) his opinion, appearing in treatment notes from the March 20, 2012 office visit, that the Plaintiff would be unable to "return to manual labor."

Second, the Plaintiff contends that the ALJ's RFC assessment, namely, that he could perform the full range of light work, was not based on substantial evidence in the record. In particular, the

Plaintiff argues that the ALJ's findings are contradicted by the opinion rendered by Dr. Morrissey on March 29, 2012, that the Plaintiff was "restricted as to working in his usual capacity" and could only "do light duty activities that would not entail lifting with his right upper extremity over 10 pounds." The Plaintiff contends that these restrictions preclude the full range of light work.

Third, the Plaintiff contends that the ALJ erred in failing to elicit testimony from an independent vocational expert regarding the extent to which the occupational restrictions identified by Dr. Morrissey eroded the range of light work jobs that the Plaintiff could realistically be expected to obtain and perform.

Finally, the Plaintiff appears to contend that the Court should independently weigh the evidence of record and hold that he is only capable of performing sedentary work. Then, according to the Plaintiff, the Court should apply Rule 201.14 of the Medical-Vocational Guidelines to determine that, based on his age, education, work experience, and RFC for sedentary work, he was disabled during the Relevant Time Period.

The Commissioner contends that these arguments lack merit; that the ALJ applied the proper legal standards; and that substantial evidence in the record supports her denial of benefits in all respects.

## II.    DISCUSSION

### A.    The Standard of Review

"Judicial review of the denial of disability benefits is narrow" and "[t]he Court will set aside the Commissioner's conclusions only if they are not supported by substantial evidence in the record as a whole or are based on an erroneous legal standard." *Koffsky v. Apfel*, 26 F. Supp. 475, 478 (E.D.N.Y. Nov. 16, 1998) (Spatt, J.).

Thus, "the reviewing court does not decide the case *de novo*." *Pereira v. Astrue*, 279 F.R.D. 201, 205 (E.D.N.Y. 2010). Rather, "the findings of the Commissioner as to any fact, if supported by

substantial evidence, are conclusive," *id.*, and therefore, the relevant question is not "whether there is substantial evidence to support the [claimant's] view"; instead, the Court "must decide whether substantial evidence supports *the ALJ's decision.*" *Bonet v. Colvin*, 523 F. App'x 58, 59 (2d Cir. 2013) (emphasis in original). In this way, the "substantial evidence" standard is "very deferential" to the Commissioner, and allows courts to reject the ALJ's findings " 'only if a reasonable factfinder would *have to conclude otherwise.*' " *Brault v. SSA*, 683 F.3d 443, 448 (2d Cir. 2012) (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994) (emphasis in original)). This deferential standard applies not only to factual determinations, but also to inferences and conclusions drawn from such facts." *Pena v. Barnhart*, No. 01-cv-502, 2002 U.S. Dist. LEXIS 21427, at *20 (S.D.N.Y. Oct. 29, 2002) (citing *Levine v. Gardner*, 360 F.2d 727, 730 (2d Cir. 1966)).

In this context, " '[s]ubstantial evidence' means 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (quoting *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004)). An ALJ's findings may properly rest on substantial evidence even where he or she fails to "recite every piece of evidence that contributed to the decision, so long as the record 'permits [the Court] to glean the rationale of [his or her] decision.' " *Cichocki v. Astrue*, 729 F.3d 172, 178 n.3 (2d Cir. 2013) (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983)). This remains true "even if contrary evidence exists." *Mackey v. Barnhart*, 306 F. Supp. 337, 340 (E.D.N.Y. 2004) (citing *DeChirico v. Callahan*, 134 F.3d 1177, 1182 (2d Cir. 1998), for the proposition that an ALJ's decision may be affirmed where there is substantial evidence for both sides).

The Court is prohibited from substituting its own judgment for that of the Commissioner, even if it might justifiably have reached a different result upon a *de novo* review. *See Koffsky*, 26 F. Supp. at 478 (quoting *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991)).

B.    **The ALJ's Evaluation of the Evidence Relating to Dr. Marano**

"The method by which the Social Security Administration is supposed to weigh medical opinions is set forth at 20 C.F.R. § 404.1527[c]." *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999). Relevant here, "[t]he regulations say that a treating physician's report is generally given more weight than other reports and that a treating physician's opinion will be controlling if it is 'well-supported by medically acceptable [evidence] and is not inconsistent with the other substantial evidence in [the] record.'" *Id.* (quoting 20 C.F.R. § 404.1527(c)(2)).

This rule – the "Treating Physician Rule" – reflects the generally-accepted view that "'the continuity of treatment [a treating physician] provides and the doctor/patient relationship he develops place him in a unique position to make a complete and accurate diagnosis of his patient.'" *Petrie v. Astrue*, 412 F. App'x 401, 405 (2d Cir. 2011) (quoting *Mongeur*, 722 F.2d at 1039 n.2); *see Genier v. Astrue*, 298 F. App'x 105, 108 (2d Cir. 2008) (noting that the regulations recognize that treating physicians "are likely to be the medical professionals most likely to provide a detailed, longitudinal picture of . . . medical impairment" (quoting 20 C.F.R. § 416.927(d)(2))).

Generally, where the ALJ declines to give controlling weight to a treating physician's opinion, he must provide the claimant with "good reasons" for doing so, and must consider various factors to determine how much weight to give the opinion. *See Blanda v. Astrue*, No. 05-cv-5723, 2008 U.S. Dist. LEXIS 45319, at *18 (E.D.N.Y. June 9, 2008); 20 C.F.R. § 404.1527(c)(2). In particular, "to override the opinion of the treating physician, [the Second Circuit] ha[s] held that the ALJ must explicitly consider, *inter alia*, (1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013) (citing *Burgess*, 537 F.3d at 129).

I.      **As to Dr. Marano's Statements that the Plaintiff was Fully Disabled for Workers' Compensation Purposes**

The Plaintiff asserts that the Treating Physician Rule required controlling weight to be assigned to Dr. Marano's assessment that he was "fully disabled" for Workers' Compensation purposes due to a "100% temporary impairment," or in the alternative, to supply good reasons for not doing so. The Court disagrees.

Although Dr. Marano is apparently a treating physician within the meaning of the Commissioner's regulations, it is well-settled that "(1) a medical source's conclusion that an individual is disabled is not entitled to controlling weight; [and] (2) a conclusion as to disability status made in the Workers' Compensation context is not binding." *Bynum v. Astrue*, No. 11-cv-5111, 2013 U.S. Dist. LEXIS 63792, at *7 (E.D.N.Y. May 3, 2013).

As to the first of these principles, one district court in this District (Block, J.) has appropriately observed that:

> [T]he treating physician rule does not require deference to [treating physicians'] conclusions that [a claimant] is disabled because the "ultimate finding of whether a claimant is disabled and cannot work" is an issue reserved to the Commissioner. *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999). "[S]tatement[s] by a medical source that you are 'disabled' or 'unable to work' " are not "medical opinions . . . but are, instead, opinions on issues reserved to the Commissioner" 20 C.F.R. §§ 404.1527(d)-(d)(1), 416.927(d)-(d)(1). As such, the regulations make clear that the Commissioner need "not give any special significance to the source" of those opinions. 20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3); *see Snell*, 177 F.3d at 133. Thus, [treating physicians'] assessments of [a claimant's] "disability status" are not entitled to controlling weight since the treating physician rule does not govern issues reserved to the Commissioner. *See Earl-Buck v. Barnhart*, 414 F. Supp. 288, 293 (W.D.N.Y. 2006) ("A treating source's statement that plaintiff 'is totally disabled,' . . . is not considered a 'medical opinion' under the treating physician's rule to which controlling weight should be assigned because it represents an opinion on an issue reserved to the Commissioner.")

*Bynum*, 2013 U.S. Dist. LEXIS 63792, at *7-*8.

Thus, in this case, contrary to the Plaintiff's contention, Dr. Marano's statements that the Plaintiff was "fully disabled" for Workers' Compensation purposes are not medical opinions that would come within the purview of the Treating Physician Rule. They are, instead, conclusory

statements regarding the ultimate issue in the case. *See Bartko v. Colvin*, No. 13-cv-373, 2014 U.S. Dist. LEXIS 139117, at *17-*18 (N.D.N.Y. Sept. 5, 2014) (Report and Recommendation), *adopted*, 2014 U.S. Dist. LEXIS 138038 (N.D.N.Y. Sept. 30, 2014) (rejecting the plaintiff's argument that the ALJ erred in failing to apply the Treating Physician Rule to a doctor's opinion that he was totally disabled; noting he had "cite[d] no authority, . . . and independent research fail[ed] to disclose, any statute, regulation, ruling or judicial precedent stating that an *ultimate-issue* opinion from a treating medical source is entitled to presumptive controlling weight under the treating physician rule, or that when controlling weight is not afforded, that opinion must then be weighed according to the six regulatory factors listed [in 20 C.F.R. § 404.1527(c)(2)], and also accompanied by a statement of good reasons justifying the weight given. And, as ultimate-issue opinion is *never* presumptively afforded controlling weight, it is doubtful that such authority exists. Application of the six regulatory factors to an ultimate-issue opinion would be awkward at best" (emphasis in original)).

As to the second principle listed above, this and other courts have consistently recognized that "[t]he disability standards under the Social Security Act and New York Workers' Compensation Law are markedly distinct; 'therefore, an opinion of disability rendered for purposes of workers' compensation is not binding under the Social Security Act.' " *Fernandez v. Apfel*, No. 98-cv-6194, 2000 U.S. Dist. LEXIS 2856, at *20 n.8 (quoting *Shiver v. Apfel*, 21 F. Supp. 2d 192, 197 (E.D.N.Y. 1998)); *see Provisero v. Colvin*, No. 14-cv-1830, 2016 U.S. Dist. LEXIS 104503, at *37 (E.D.N.Y. Aug. 8, 2016) (Spatt, J.) (noting that a treating physician's assessment of a partial disability for Workers' Compensation purposes was "not determinative" in a civil appeal because "the standard for what constitutes a 'disability' under the Social Security Act is more stringent" (citation omitted)); *Davies v. Astrue*, No. 08-cv-1115, 2010 U.S. Dist. LEXIS 70401, at *14 (N.D.N.Y June 17, 2010) (Report and Recommendation), *adopted*, 2010 U.S. Dist. LEXIS 70418 (N.D.N.Y. July 14, 2010)

("Contrary to Plaintiff's argument, the ALJ properly discounted [a treating physician's] opinions that Plaintiff was unable to work because they were rendered for a Worker's Compensation claim").

For these reasons, the Court finds that the ALJ correctly declined to give any special significance to Dr. Marano's pronouncements that the Plaintiff was "fully disabled" for Workers' Compensation purposes. The Court also finds that, because Dr. Marano's statements in this regard were ultimate-issue opinions pertaining solely to an outside agency's disability determination, the ALJ was under no additional obligation to weigh the statements according to the Commissioner's regulatory factors and set forth good reasons for the weight given.

On the contrary, consistent with his duties under the regulations, the ALJ explicitly considered Dr. Marano's statements for the fact that they were made; discussed the balance of objective medical evidence contained in LIBJ's records and the results of related diagnostic studies; and, in the Court's view, arrived at a reasoned RFC determination. *See* Social Security Ruling ("SSR") 06-03p, *available at* 2006 SSR LEXIS 5, at *17 (Jan. 1, 2006) ("[W]e are required to evaluate all the evidence in the case record that may have a bearing on our determination or decision of disability, including decisions by other governmental and nongovernmental agencies and . . . [t]herefore, evidence of a disability decision by another government or nongovernmental agency cannot be ignored and must be considered"); *see also Davies*, 2010 U.S. Dist. LEXIS 70401, at *14-*15 (although a treating physician's disability assessment, rendered for Workers' Compensation purposes, was not binding or entitled to controlling weight, the ALJ was obligated not to ignore it, and fulfilled his responsibilities by specifically discussing the medical evidence underlying the opinion). Applying these standards, the Court finds no error in the ALJ's approach.

2.    **As to Dr. Marano's Statement that the Plaintiff was Unable to Return to Manual Labor**

The Court also disagrees with the Plaintiff's argument that the ALJ failed to appropriately weigh Dr. Marano's opinion that he would be unable to "return to manual labor." The Plaintiff

argues that this restriction was entitled to controlling weight, and precludes the performance of light work, as a matter of law.

Initially, by opining that the Plaintiff would be unable to "return to" manual labor, it is clear that he was referring to the Plaintiff's prospects of returning to his position as a Sales Associate at Home Depot, which, as the Plaintiff testified, involved physical activities like stocking the shelves with inventory; rearranging the store displays; and performing general maintenance, such as sweeping and picking up items from the floor. Evidently, the lifting requirements of this position were demanding, as the Plaintiff estimated that the items he lifted as part of his job responsibilities ranged in weight from one pound to one hundred or even one hundred fifty pounds. *See* R. 36.

Under these circumstances, the Court finds that there is nothing inherently inconsistent between Dr. Marano's opinion that the Plaintiff could not return to such strenuous labor and the ALJ's assessment that the Plaintiff nevertheless remained functionally capable of performing light work jobs, which, by definition, require "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weight up to 10 pounds." 20 C.F.R. § 404.1567(b). Therefore, to the extent the Plaintiff contends that the ALJ failed to give appropriately controlling weight to Dr. Marano's opinion, his argument lacks merit. On the contrary, it appears clear that the ALJ *did* give controlling weight to Dr. Marano's opinion in this regard by specifically finding that the Plaintiff's "past relevant work as a Sales Associate [at] Home Depot" "requires a greater exertional capacity than [he] possessed," thereby rendering him "unable to return to his past work."

Accordingly, the Court identifies no legal error in the ALJ's evaluation of Dr. Marano's opinion that he is unable to return to manual labor. Therefore, to the extent the Plaintiff seeks to overturn the ALJ's decision based on an alleged violation of the Treating Physician Rule and/or a misevaluation of the evidence relating to Dr. Marano, his cross-motion for judgment on the pleadings is denied.

C.    **Whether the ALJ's RFC Assessment is Based on Substantial Evidence in the Record**

The Plaintiff next argues that that ALJ's RFC assessment, namely, that the Plaintiff was functionally capable of performing the full range of light work, was not based on substantial evidence in the record.

As noted above, in this context, " '[s]ubstantial evidence' means 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Burgess*, 537 F.3d at 128 (quoting *Halloran*, 362 F.3d at 31).  In this regard, the relevant question is not "whether there is substantial evidence to support the [claimant's] view"; instead, the Court "must decide whether substantial evidence supports *the ALJ's decision*."  *Bonet*, 523 F. App'x at 59.  Upon careful review of the entire record, the Court finds that the ALJ's RFC determination is supported by substantial evidence.

As noted above:

> [L]ight work is defined as work involving "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds."  20 C.F.R. § 404.1567(b). Jobs in this category require "a good deal of walking or standing" or "sitting most of the time with some pushing and pulling of arm or leg controls."  *Id.*  To be considered able to do light work, a person "must have the ability to do substantially all of these activities" and is also considered able to do sedentary work unless additional lifting factors preclude such work. *Id.*

*Delacruz v. Astrue*, No. 10-cv-5749, 2011 U.S. Dist. LEXIS 150404, at *61 (S.D.N.Y. Dec. 1, 2011) (Report and Recommendation), *adopted*, 2011 U.S. Dist. LEXIS 146584 (S.D.N.Y. Dec. 20, 2011).

Initially, to the extent that the full range of light work requires "a good deal of walking or standing," and prolonged periods of sitting, the Court notes that that the Plaintiff does not allege, and the evidence of record does not support a finding that he is restricted at all in the performance of these activities.  In this regard, Dr. Dutta assessed no limitation in the Plaintiff's ability to sit, stand,

or walk, and, of importance, the Plaintiff himself conceded at the administrative hearing that he is able to climb stairs; stand for a half hour; walk a mile; and sit for "a few" hours.

Rather, the Plaintiff contends that he is unable to perform light work because he cannot meet the lifting and/or carrying requirements of such jobs, *i.e.*, lifting up to 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. However, there is substantial evidence in the record to suggest otherwise.

First, the Court notes that the piece of evidence relied upon exclusively by the Plaintiff, namely, Dr. Morrissey's March 29, 2012 medical opinion, fails to provide support for his position, and actually supports the ALJ's RFC assessment. As discussed above, Dr. Morrissey opined that, with regard to the Plaintiff's ability to work in his "usual capacity" – that is, working as a Sales Associate at Home Depot – he would be "restricted" to performing only "light duty activities that would not entail lifting with his right upper extremity over 10 pounds."

In the Court's view, this medical opinion is consistent with a "light work" RFC, as it clearly indicates that, using only his impaired arm, the Plaintiff is not precluded from lifting and/or carrying the minimum amount of weight required for light work jobs.

Dr. Morrissey's opinion in this regard is also internally consistent with Dr. Marano's opinion, discussed above, that the Plaintiff would be unable to "return to manual labor." In both cases, the examining doctors found only that the Plaintiff's shoulder injury limited his ability to perform the strenuous requirements of his past job at Home Depot – opinions which the ALJ explicitly accepted in concluding that the Plaintiff could not return to his past work.

However, contrary to the Plaintiff's contentions, neither Dr. Morrissey nor Dr. Marano opined that the nature and/or severity of his impairment prevented him from meeting the relevant lifting/carrying criteria for the full range of light work.

In this regard, the ALJ's RFC assessment is substantially supported by the objective medical evidence in the record. For example, following the Plaintiff's surgery, he visited LIBJ eight separate

times between September 27, 2011 and June 20, 2012. On each occasion, despite the Plaintiff's reports of persistent pain in his right arm and shoulder, Dr. Marano noted only generalized tenderness; a well-healed surgical incision; and continual improvement in the Plaintiff's range of motion. In particular, during his first post-operative appointment on September 27, 2011, the Plaintiff was able to perform abduction and flexion to 80 degrees and was unable to perform measurable internal or external rotations. However, again, despite complaints of pain, by June 20, 2012, the Plaintiff's abduction increased to 90 degrees; his flexion increased to 150 degrees; his external rotation improved to 80 degrees; and he achieved full internal rotation.

Similarly, during his first visit with the Plaintiff on May 12, 2011, Dr. Morrissey noted that the range of motion in his right shoulder was "entirely limited." However, approximately two months after his surgery, in November 2011, Dr. Morrissey expressly noted that, despite reports of pain, the Plaintiff was apparently responding well to physical therapy several times per week, which had improved his range of motion and was helping to relieve some of his pain. By March 29, 2012 Dr. Morrissey noted significant improvement in the Plaintiff's range of motion and expected that physical therapy would have achieved its maximal benefit within six weeks.

These medical findings are consistent with the progress notes from the Plaintiff's physical therapist at Westhampton Sports Rehabilitation in Westhampton Beach. In particular, the records from the period in question reflect significant physiological improvement, despite a tendency on the Plaintiff's part to engage in "muscle guarding," a natural reflex the body uses to protect itself from further injury. As Dr. Morrissey and Dr. Marano also noted, by May 11, 2012, the Plaintiff's therapist observed that, despite complaints of pain, his active range of motion was approaching full.

Finally, the ALJ's RFC assessment is mostly consistent with the Plaintiff's hearing testimony and his responses to the July 10, 2012 function report. Most importantly, the Plaintiff testified unequivocally that he that he is able to lift at least 20 pounds with his left arm. Taken together with Dr. Morrissey's opinion that he can also lift ten pounds with his right arm, and the evidence of

record that the Plaintiff's full range of motion in his post-surgical shoulder had been nearly restored, the Court is satisfied that the record supported the ALJ's finding that the Plaintiff meets the relevant lifting/carrying criteria for the full range of light work.

Further, the Plaintiff testified that he is only mildly limited in his activities of daily living, and retains the ability to shave, shower, practice basic hygiene, and get dressed without help. His shoulder impairment does not materially impede his ability to put on a coat; button buttons; tie a bow; zip a zipper; and buckle a belt buckle. Nor, apparently, does it prevent him from driving; shopping; doing light housework; writing with his right hand; playing the guitar; or using a computer. As noted above, he reported to Dr. Acer that he even gardens and cleans his car.

Although the Plaintiff claims to experience pain while performing some or all of these activities, he testified at the administrative hearing, and the relevant medical records indicate that prescription pain relievers and a TENS unit effectively moderate this symptom.

Accordingly, in view of the record as a whole, the Court finds that, to the extent the ALJ found the Plaintiff capable of meeting the exertional demands of light work during the Relevant Time Period, his RFC assessment was supported by substantial evidence. To the extent the Plaintiff seeks to overturn the underlying decision on this ground, his cross-motion for judgment on the pleadings is denied.

**D.    The ALJ's Decision Not to Elicit Testimony from an Independent Vocational Expert**

The Plaintiff next argues that the ALJ erred by failing, at the administrative hearing, to elicit testimony from an independent vocational expert regarding the extent to which the restrictions identified by Dr. Morrissey – namely, the need to perform "light duty activities that would not entail lifting with his right upper extremity over 10 pounds" – eroded the range of light work jobs in the national economy that the Plaintiff could realistically be expected to obtain and perform. This argument lacks merit.

I.       The Applicable Law

Under the five-step sequential framework promulgated by the SSA, a claimant is not disabled if, given his or her impairment, there nevertheless exists another type of work that he or she can do. *See Burgess*, 537 F.3d at 120 (quoting *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003)). In this regard, at the final step of the analysis, the Commissioner bears the burden of showing that, "in light of the claimant's RFC, age, education, and work experience, the claimant is 'able to engage in gainful employment within the national economy.' " *Felix*, 2012 U.S. Dist. LEXIS 102949, at *19 (quoting *Sobolewski v. Apfel*, 985 F. Supp. 300, 310 (E.D.N.Y. 1997)).

There are two broad categories of impairments that are germane to this inquiry: exertional limitations and non-exertional limitations. "Exertional" limitations relate to "the 'strength' requirements of jobs," *Sergenton v. Barnhart*, 470 F. Supp. 2d 194, 202 (E.D.N.Y. 2007), such as the Plaintiff's ability to sit, stand, walk, lift, carry, push, and pull, *see* 20 C.F.R. § 404.1545(b); *see Rios v. Comm'r*, No. 12-cv-5102, 2015 U.S. Dist. LEXIS 69855, at *20-*21 n.1 (E.D.N.Y. May 29, 2015) (noting that "[a]n exertional limitation occurs '[w]hen the limitations and restrictions imposed by [a claimant's] impairment(s) and related symptoms, such as pain, affect only [his] ability to meet the strength demands of jobs (sitting, standing, walking, lifting, carrying, pushing, and pulling)" (citation omitted)).

By contrast, "non-exertional limitations are those that do *not* implicate the strength required to perform a particular task, such as mental, sensory, and skin impairments that may impose environmental restrictions on where a person may work." *Gonzalez v. Astrue*, No. 06-cv-5403, 2008 U.S. Dist. LEXIS 75722, at *24 (E.D.N.Y. Sept. 30, 2008) (emphasis supplied); *see Baker v. Apfel*, No. 97-cv-757, 1998 U.S. Dist. LEXIS 15444, at *4 n.3 (W.D.N.Y. Aug. 10, 1998) ("A 'nonexertional impairment' is defined as a limitation or restriction which 'affect[s] [a claimant's] ability to meet the demands of jobs other than the strength demands, that is, demands other than sitting standing,

walking, lifting, carrying, pushing or pulling are considered nonexertional'" (quoting 20 C.F.R. § 416.969a(a)).

Where, as here, a claimant suffers only from exertional impairments, *i.e.*, strength limitations, then the Commissioner may satisfy her burden, as she apparently did in this case, by resorting to the applicable Medical-Vocational guidelines, commonly referred to as the "grids" (the "Grids"). *See Pratts v. Chater*, 94 F.3d 34, 38-39 (2d Cir. 1996); *see Bapp v. Bowen*, 802 F.2d 601, 604 (2d Cir. 1986) (citing 20 C.F.R. Pt. 404, Subpt. P, App. 2). "The [G]rids 'take[ ] into account the claimant's residual functional capacity in conjunction with the claimant's age, education and work experience,'" *Rosa*, 168 F.3d at 78 (quoting *Zorilla v. Chater*, 915 F. Supp. 662, 667 (S.D.N.Y. 1996)), and, "[b]ased on these considerations, . . . indicate whether the claimant can engage in any substantial gainful work existing in the national economy." *Id.*

As described above, in this case, the ALJ used the SSA's five-step methodology to determine that, based on application of the Grids, the Plaintiff was not disabled partly because he retained the functional capacity to perform the full range of light work during the Relevant Time Period. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2, RR. 201.14, 202.21.

However, as the Plaintiff notes, exclusive reliance on the Grids is not appropriate in all cases, and may, sometimes, be "inappropriate where the [Grids] fail to describe the full extent of a claimant's physical limitations." *Rosa*, 168 F.23 at 78; *see Heckler v. Campbell*, 461 U.S. 458, 462 n.5, 103 S. Ct. 1952, 76 L. Ed. 2d 66 (1983) (observing that the Grids will only be applied where they accurately describe a claimant's abilities and limitations). For example, "'sole reliance on the [G]rid[s] may be precluded where the claimant's exertional impairments are compounded by significant nonexertional impairments that limit the range of [ ] work that the claimant can perform.'" *Id.* (quoting *Bapp*, 802 F.2d at 603).

In such cases, where a claimant has both exertional and nonexertional limitations, the Grids are used as a framework in the disability determination, and the "ALJ 'must consider and address on the record the combined effects of the claimant's exertional and non-exertional limitations and the advisability of additional testimony before resorting to the [Grids]." *Id.* at \*43-\*44 (quoting *Nigino v. Astrue*, No. 04-cv-3207, 2009 U.S. Dist. LEXIS 27595, at \*15 (E.D.N.Y. Mar. 30, 2009)). If the ALJ finds that the claimant's nonexertional limitations "significantly diminish the range of work the claimant can perform," he "must hear testimony from a vocational expert or seek out similar evidence that that there are jobs 'in the national economy which the claimant can obtain and perform.'" *Williams*, 2010 U.S. Dist. LEXIS 130273, at \*44 (quoting *Nigino*, 2009 U.S. Dist. LEXIS 27595, at \*15).

2.    **Application to the Facts of this Case**

Applying these standards, the Court concludes that the testimony of an independent vocational expert was not required in this case.

As the Plaintiff readily concedes, at the Relevant Time Period, he suffered from a solely exertional limitation, namely, an alleged difficulty lifting and/or carrying heavy objects. *See* Pl. Br. at 23 (arguing that the ALJ was obligated to elicit expert testimony in light of "the opinion of Dr. Morrissey regarding lifting restrictions"). However, as outlined above, under such circumstances, the law is clear that an ALJ may resort to the Grids in making a disability determination without calling a vocational expert to testify or otherwise seeking out evidence regarding the amount of jobs in the national economy that someone within the claimant's limitations can obtain and perform. *See Pratts*, 94 F.3d at 38-39; *Woodmancy v. Colvin*, 577 F. App'x 72, 76 (2d Cir. 2014) (noting that, where "a claimant does not have [non-exertional] limitations, the ALJ may rely on the medical vocational guidelines (the "grids") to adjudicate the claim").

Therefore, contrary to the Plaintiff's contention, when confronted with allegations of a purely exertional impairment, the ALJ was under no obligation to elicit expert testimony and properly resorted to the Grids, which directed a finding of "not disabled."

The Plaintiff's reliance on SSR 85-15, entitled "The Medical-Vocational Rules as a Framework for Evaluating Solely Nonextertional Impairments," is clearly misplaced. As the Commissioner correctly notes – and as its title aptly signals – that regulatory opinion deals exclusively with situations where a claimant experiences "solely nonexertional" limitations, which, as noted above, the Plaintiff admits he does not have.

As outlined above, the law in cases involving nonexertional limitations requires ALJs to develop the record in order to determine whether, and to what extent, the claimant's non-exertional limitations erode the Plaintiff's base of potential jobs above and beyond his exertional limitations. *See Blanda*, 2008 U.S. Dist. LEXIS 45319, at *45 (noting that "where a claimant's work capacity is significantly diminished beyond any exertional limitation, application of the grids is inappropriate because the grids do not take nonexertional limitations into account"). Only under those narrow circumstances, which are not present here, SSR 85-15 instructs that "[t]he assistance of a vocational expert may be helpful." SSR 85-15, *available at* 1985 SSR LEXIS 20, at *9 (Jan. 1, 1985).

Accordingly, the Court does not concur with the Plaintiff's argument that the ALJ erred in failing to elicit testimony from an independent vocational expert regarding the extent to which the occupational restrictions identified by Dr. Morrissey eroded the range of light work jobs that the Plaintiff could realistically be expected to obtain and perform. To the extent the Plaintiff seeks to overturn the underlying decision on this ground, his cross-motion for judgment on the pleadings is denied.

E.     **The Plaintiff's Remaining Contention**

Finally, the Plaintiff contends that the Court should independently weigh the evidence of record and hold that he is only capable of performing sedentary work. However, having found that

substantial evidence supported the ALJ's RFC assessment, the Court finds it unnecessary to address the merits of this argument.

### III. CONCLUSION

Based on the foregoing, it is hereby ordered that the Commissioner's motion under Fed. R. Civ. P. 12(c) for judgment on the pleadings is GRANTED;

The Plaintiff's cross-motion under Fed. R. Civ. P. 12(c) for judgment on the pleadings is DENIED; and

The November 21, 2014 final decision of the Commissioner that the Plaintiff is not entitled to Social Security disability insurance benefits for the period from March 31, 2011 through September 30, 2012 is AFFIRMED in all respects.

The Clerk of the Court is respectfully directed to close this case.

It is **SO ORDERED.**

Dated:        Central Islip, New York
               September 9, 2016        */s/ Arthur D. Spatt*
                                       ARTHUR D. SPATT
                                       United States District Judge